**Patricia BONDS, Plaintiff,**

v.

**Ira Michael HEYMAN, Defendant.**

**Civil Action No. 95–0044 (RCL).**

United States District Court,
District of Columbia.

Jan. 14, 1997.

---

John F. Karl, Jr., McDonald & Karl, Washington, DC, for Plaintiff.

Keith V. Morgan, Asst. U.S. Atty., U.S. Attorney's Office, Washington, DC, Elaine L. Johnson, Assistant General Counsel, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the court on plaintiff's motion for partial summary judgment, defendant's motion to dismiss and for summary judgment, and plaintiff's motion for a preliminary injunction to prevent the defendant Smithsonian Institution from eliminating plaintiff Bonds' position at the National Postal Museum. For the reasons stated below, plaintiff's motion for partial summary judgment will be denied, as will defendant's motion to dismiss and for summary judgment; plaintiff's motion for a preliminary injunction will be granted.[1]

*BACKGROUND*

Plaintiff, an African-American female aged 58 has been employed by the Smithsonian Institution since 1957. In 1988, she filed a discrimination suit against the Smithsonian, naming Assistant Secretary Tom L. Freudenheim as one of the allegedly discriminating officials. Pl.'s Stat. of Facts not in Disp., Jan. 22, 1996 at 1. That case was settled in 1990.

In 1991, Bonds, then a GS-13 Program Analyst in the Office of the Assistant Secretary for the Arts and Humanities ("OASAH"), alleges that she was interested in promotion to GS-14 Program Analyst, the slot held by Barbara Pierce. Pl.'s Stat. of Facts not in Disp. at 3. Pierce left, and in late 1992 Freudenheim hired a white male aged 33 for that position.[2] Bonds was not given an opportunity to compete. Whether this failure to promote the plaintiff to this position was an act of discrimination or retaliation for Bonds' earlier complaint against Freudenheim comprises the key underlying issue in this case.

In the meantime, Bonds was detailed in November 1993 to the National Postal Museum and then promoted to a GS-14 position, that of Assistant Director for Finance and Administration, in September of 1994. She has served at this position and grade since then. The Smithsonian, however, has announced that it is eliminating Bonds' job as part of a reduction-in-force ("RIF") plan. Bonds, due to be fired on November 4, 1996 was granted a TRO by this court on November 1, 1996—extended by agreement to January 15, 1997 to allow briefing—after claiming the RIF was retaliatory in nature. Bonds now prays for a preliminary injunction

1. Plaintiff has filed an amended complaint addressing the issues surrounding her reduction-in-force.

2. There is dispute about whether Pierce's actual federal position or an identical position paid for with trust funds was, in fact, created. But because Bonds viewed this as the same position, it is referred to as Pierce's position.

against the defendant, allowing her to maintain her position at the museum until trial on the merits can resolve the issue.

For the reasons stated below, plaintiff's motion for partial summary judgment on the underlying failure to promote action is denied, as is defendant's motion to dismiss and for summary judgment. Plaintiff's request for a preliminary injunction is granted.

*DISCUSSION*

A. *Summary Judgment*

Plaintiff has filed for partial summary judgment in this case, asking the court to rule, as a matter of law, that the Smithsonian acted illegally in using federal funds to pay Haas' salary, and as a result it may not rebut Bonds' prima facie case. Defendant has filed a motion to dismiss and for summary judgment.

Summary judgment is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *E.g., Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. *E.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970).

With respect to plaintiff's motion for partial summary judgment, that must be denied. Plaintiff has presented no evidence which would permit this court to rule, as a matter of law, that the Smithsonian's system of funding Haas' position is illegal by its very nature. The Smithsonian has a dual system of funding its personnel, one which is federal and subject to federal regulations, and another which is administered by a private trust fund, and subject to a separate, but often similar, set of Smithsonian regulations. Plaintiff alleges that the defendant, as a way to avoid placing Pierce's GS–14 position in competition—where Bonds would be able to openly compete for it—"swapped" the federal money used to fund that position for trust money, to allow a clandestine, or in the words of the plaintiff, "secret recruitment" for that position. Haas, serving as a trust fund employee elsewhere in the Smithsonian, was hired for Pierce's position, but now the position was a trust fund position. Plaintiff Bonds was not considered for the promotion, and claims the entire manner by which the position was kept from open competition was illegal.

Defendant responds that there is nothing illegal about the procedures that were followed, and further, that "Smithsonian personnel policies applicable to trust fund employees, which are modeled on federal personnel policies, allow the non-competitive reassignment of a Smithsonian trust fund employee to another Smithsonian position at the same grade level." Def.'s Mem. of Points and Auth., Feb. 8, 1996 at 24. The Smithsonian paints a picture of this transfer as a run-of-the-mill process, without illegal taint.

With all favorable inferences given the defendant on plaintiff's motion for partial summary judgment, it is impossible, at this time, to grant plaintiff's motion. The issue of whether the non-competitive recruitment was, in fact, a "shell game" used to cheat plaintiff out of a promotion in retaliation for her previous filing of a sexual harassment complaint, or whether Freudenheim, in a legal and nondiscriminatory manner, merely used this process to select the best person for the job, is an issue best left to the jury.

With respect to defendant's motion to dismiss and for summary judgment, this, too, must be denied. Contrary to defendant's assertion, Bonds has, indeed, established a prima facie case of discrimination, and has put forth enough evidence to establish that the denial of her promotion may have been pretextual. Plaintiff clearly survives defendant's motion to dismiss.

As well, she survives defendant's motion for summary judgment, given the multitude of factual disputes in this case. One particular area necessitates special discussion, however, because it cuts to the heart of this court's jurisdiction. That is the issue of whether Bonds has forfeited her cause of action for failure to seek administrative review in a timely fashion. An employee claiming unlawful discrimination under Title VII

has 45 days to consult with an equal employment opportunity [EEO] counselor. 29 C.F.R. § 1614.105(a)(1). If Bonds failed to comply in a timely manner with the statutory requirements for handling a discrimination complaint, then the court has no choice but to dismiss, unless there exist grounds for equitable tolling.

Rick Haas, the person Freudenheim is alleged to have promoted in lieu of Bonds, was first brought into Freudenheim's office with this new job on November 1, 1992. Yet, Bonds did not meet with an EEO counselor until April 13, 1993, or file an EEO complaint with the Smithsonian until May 20, 1993: over six months after Haas's promotion. The reason for this delay is hotly contested.[3]

Plaintiff maintains that she did not know until March 18, 1993, that Haas was appointed her supervisor, and this was the defining event which led her to believe she would never be promoted to Pierce's position. Within 45 days of learning that Haas was made her supervisor, Bonds filed an EEO complaint alleging age, race, and sex discrimination.

Defendant paints a completely different picture of events, however. The Smithsonian asserts that Bonds knew as early as October 29, 1992, and certainly by December 4, 1992, that Haas was hired to take Pierce's position, and Bonds knew by then she would not be promoted. To this end, the Smithsonian produces much evidence suggesting that Bonds knew, well before her May 20, 1993 filing, that Haas was in a grade 14 position, and that federal funds used to pay for Pierce's post would be diverted to fund Haas's position. Thus, defendant argues that Bonds was quite aware she would not be eligible for promotion to Pierce's grade 14 Program Analyst slot. Furthermore, the Smithsonian views as spurious Bonds' claim that she first learned she had been passed over for promotion when she was informed Haas was made her supervisor. After all, Pierce had not been Bonds' supervisor, so why would learning that Haas received this duty be the point where Bonds discovered injury? Thus, defendant wants Bonds out-of-court for failing to act in a timely manner on her complaint.

The Government, mounts formidable evidence to suggest that even when taken in a light most favorable to plaintiff, she cannot press a case in federal court since she has failed to prove she filed a timely administrative complaint.

But there are numerous difficulties with defendant's assertions, as well. For example, the Smithsonian seems to allege that it was well known Haas would be filling Pierce's slot, but also indicates that a completely new trust fund position was being created for him. But if a new position were being created for Haas—a position which did not formally crystallize for another year—then Bonds should *not* have had reason to believe she was being kept from contention for Pierce's position. Indeed, defense counsel suggested at motions hearing on November 1, 1996 that Haas continued to operate in his "new" position, (a matter further complicated by the fact that it was funded by the Smithsonian's trust funds, not, as Pierce's position was, by federal monies) while Pierce's Program Analyst position remained unfilled. Essentially, the government's position boils down to the suggestion that Bonds should have known she would not be promoted to Pierce's position because Haas already had it—even though defendant argues at the same time that he really held a different position.

Most telling is the exchange of letters that occurred between Claudine Brown, Bonds' supervisor, and Bonds, on March 18, 1993 and March 22, 1993: the very exchange which led Bonds to file a complaint.

Apparently, Bonds had tried to schedule meetings with Brown, but these were always scrubbed for one reason or another. On March 18, 1993, Brown wrote to Bonds:

> It is my understanding that one of the meetings which you have attempted to schedule involves your promotion to a GS 14. May I suggest that you schedule a

3. It should be noted that plaintiff claims she sought a meeting with a Smithsonian EEO counselor on March 18, 1993, but this could not be scheduled until April 13. Nevertheless, even the earlier claimed date is outside the requisite 45 days.

preliminary appointment regarding this matter with Rick Haas, your immediate supervisor. It would be helpful if you were to come to such a meeting with some documentation of your most recent accomplishments and a written justification for your request after you have followed this procedure.

If it were so clear that Bonds would be unable to take Pierce's GS–14 position as of October 29, 1992 or December 4, 1992 as the government argues, why didn't Brown indicate this? If anything, she gives every indication that a GS–14 promotion was still possible for Bonds in March of 1993.

Bonds' reply on March 22, 1993 is also important. There, she writes:

> In no offense to Rick [Haas], there is no plausible reason to schedule a preliminary meeting with him (whom you state is my immediate supervisor) to discuss a promotion to the same grade he occupies. This has now led to a larger and more complex issue, which is how do I get promoted to a GM–14? It is quite obvious my opportunity for promotion was lost when Rick was reassigned as a grade 14 to this office and appointed my immediate supervisor. Concurrently, his reassignment has had an adverse impact on my ability to be promoted to a GM–14. As to my most recent accomplishments, they are documented in my FY 92 performance plan and appraisal, and I believe my request is justified because I have been in the same grade since 1987.

Especially given this dialog, this court cannot conclude, as a matter of law, that Bonds' complaint was untimely. Therefore, defendant's motion for summary judgment on Count I of the complaint is denied.

B. *Preliminary Injunction*

There are essentially three preliminary injunction questions placed before the court. First, whether plaintiff must exhaust available administrative remedies with respect to her discharge under the RIF before seeking an injunction; second, whether plaintiff, in a case involving government personnel decisions, should be required to make a heightened showing of harm as opposed to the typical "irreparable" showing for a preliminary injunction; and third, whether plaintiff otherwise meets the other requirements for a preliminary injunction.

1. *Exhaustion of Administrative Remedies*

The defendant argues the well-established principle that Title VII plaintiffs must exhaust their administrative remedies before filing a civil action in federal district court. *Love v. Pullman Co.,* 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972); *Brown v. General Services Administration,* 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). It is undisputed that plaintiff has not exhausted administrative relief regarding her dismissal under the RIF. Therefore, the Smithsonian asks that the preliminary injunction be denied until administrative review occurs. The defendant likewise characterizes plaintiff's complaint as alleging both discrimination and harmful procedural error, requiring her to choose between filing an administrative complaint with the Smithsonian, or appealing to the Merit Systems Protection Board. She may pick either, but she may not step into court to challenge the RIF until she has acted through one of those administrative channels, defendant posits.

Plaintiff responds to these allegations with the simple fact that a court does have the power to grant interim injunctive relief in a civil rights case prior to plaintiff's exhaustion of administrative remedies. *Wagner v. Taylor,* 836 F.2d 566, 574–75 (D.C.Cir.1987). As the court held in *Wagner,* "[h]aving concluded that private-sector employees are entitled to seek interim injunctive relief to maintain the status quo, we are bound by precedent to hold that federal employees enjoy the same right." *Id.* at 574. This much is conceded by defendant. However, the Smithsonian argues this procedure of seeking interim equitable relief is available only "when a district court is asked to issue a stay in aid of its own jurisdiction." Def.'s Opp. to Pl.'s Emerg. Mot. for Exped.Disc. at 5. Plaintiff, however, views *Wagner* as casting a broader net, allowing a court to maintain the status quo while she pursues administrative remedies.

Furthermore, plaintiff alleges the RIF is a retaliatory act for her filing of claims against the Smithsonian. In cases where an employee has sued an employer for discrimination, and retaliation against that employee occurs during the pendency of that suit, the plaintiff will not be required to jump through administrative hoops before seeking an injunction. As this court previously held in *Webb v. District of Columbia,* 864 F.Supp. 175 (D.D.C.1994) in circumstances where an initial complaint with an administrative agency alleges discrimination and acts of reprisal for previous grievances lodged against the department, it is unnecessary for an employee to refile a new complaint upon every new instance. *Id.* at 184. Rather, a plaintiff may raise the retaliation claim for the first time in federal court. *Id.* (*citing Nealon v. Stone,* 958 F.2d 584, 590 (4th Cir.1992)). It is true, indeed, that part of the reasoning behind this rule is to overcome an employee's reluctance to file a complaint with an administrative agency—after all, if the plaintiff is forced to continually return to administrative procedures after every new instance of retaliation, this may well invite an employer to take additional acts of reprisal, knowing that the employee has no choice but to push more papers.

Forcing an employee to return to a state agency or the EEOC after every new act of retaliation would simply "erect a needless procedural barrier." *Webb,* 864 F.Supp. at 184 (*citing Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir. 1973)). As this Circuit has held, if the employer was on notice that its actions allegedly violated Title VII and was afforded an adequate opportunity to pursue a mutually satisfactory resolution with the employee, it would be futile to demand "a stream of further administrative pleadings denoted 'charge' or 'complaint.'" *Loe v. Heckler,* 768 F.2d 409, 420 (D.C.Cir.1985). The importance of administrative review as a pre-cursor to judicial review is obvious. But when there are allegations of ongoing retaliation after an employee has sought EEOC review on prior related claims, that employee may apply for injunctive relief in federal court so that subsequent claims may be considered with prior ones.

Bonds put the Smithsonian on notice when she filed for expedited discovery with respect to the RIF. The Smithsonian then had the opportunity to reach some form of accord with her. This, it did not, or was unable, to do. Thus, Bonds is free to seek relief from defendant's plans to dismiss her in federal court at this time.

2. *Preliminary Injunction Requirements*

Under the traditional test for the issuance of preliminary injunctions, the court must consider (1) whether plaintiff is likely to prevail on the merits; (2) whether plaintiff will show irreparable harm absent interim relief; (3) whether interim relief would significantly harm other interested parties; and (4) whether the public interest would be served by granting or denying preliminary relief. *Randolph–Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 110 (D.C.Cir.1986).

a. *Likelihood of Prevailing on the Merits*

To prevail on a claim of retaliation under Title VII, the plaintiff must first make out a prima facie case of retaliation. Defendant then has the burden to put forth a nondiscriminatory reason for its actions. The plaintiff may then attempt to show the employer's proffered explanation is pretextual. *Mitchell v. Baldrige,* 759 F.2d 80, 87 (D.C.Cir.1985) *citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

1. *The Prima Facie Case*

To establish a prima facie case of retaliation plaintiff must show (1) that she was engaged in statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two. *Barnes v. Small,* 840 F.2d 972, 976 (D.C.Cir.1988) *citing McKenna v. Weinberger,* 729 F.2d 783, 790 (D.C.Cir.1984).

It is undisputed that Bonds was engaged in protected activity—the bringing of her underlying lawsuit—and the Smithsonian does not seriously contest that termination of employment is an adverse employment ac-

tion. What defendant does attack, however, is the existence of any causal connection between plaintiff's protected activity and the Smithsonian's decision to RIF her.

Defendant essentially argues that Bonds must present evidence of actual cause, which the Smithsonian claims she has not done, or she must show such temporal proximity between the protected activity and the adverse action that a causal nexus may be inferred. On this point the Smithsonian vigorously argues that there is no such time connection, as, in defendant's words, "[t]he actions complained of in the Complaint took place more than four years ago, in a different office, with different people as discriminating officials. In the meantime, plaintiff has been promoted, received favorable performance appraisals, and has not suffered any adverse employment actions." *Id.*

But in the court's view, this does not hold water. In the first place, even though Bonds' claim that she was wrongfully passed over for a promotion did take place several years before this current action, she was, and has been, engaged in contentious litigation with the Smithsonian at the time it announced its intentions to terminate her employment. When seen in this light, there has not been a half-decade lapse between the adverse action and the protected activity—which would likely destroy any causation argument—but rather, there has been an adverse action concurrently with Bonds' protected activity. A jury could easily make the inference that the Smithsonian is trying to snuff the fight out of an employee who has become a troublesome litigant.

Secondly, to suggest that the present RIF has taken place in a vacuum, as defendant has done, is disingenuous. James Bruns, Director of the National Postal Museum and one of the key individuals in the determination to RIF Bonds, indicates in his declaration that Bonds informed him of her litigation with the Smithsonian back in 1993. Bruns Decl., Def.Opp. to Pl.'s Mot. for Prel. Inj., Dec. 23, 1996, Exh. 1 at 16–17. He maintains that he has never taken that litigation, of which he claims to know no details into account in any decisions with regard to Bonds, but as will be seen below, Bonds is entitled to put forth her evidence that allegedly nondiscriminatory action by her employer is pretextual. The facts of this entire action lead the court to believe that Bonds is substantially likely to make out her prima facie case, which is all that is necessary in the preliminary injunction inquiry. There have been no motions for summary judgment on the RIF and the court will not rule at this time on whether Bonds has or has not made out her case for that purpose. It suffices to say for the present that Bonds will most likely be able to prove it.

2. *Defendant's Nondiscriminatory Rationale*

Given that Bonds surmounts her first hurdle, the next step in determining whether Bonds is likely to prevail in her litigation against the Smithsonian is whether the defendant will be able to put forth a nondiscriminatory rationale for RIFing Bonds. It has done so. Defendant claims that Bonds' termination is the unfortunate result of budget shortfalls and duplicative work. Def.'s Opp. to Pl.'s Mot. for Prel.Inj., Dec. 23, 1996 at 26–27. In addition, Bonds was not the only employee RIFfed, and, the Smithsonian claims, Bruns' decision to eliminate Bonds' position was based on several objective, nondiscriminatory criteria. *Id.*

3. *Pretext*

In order for Bonds to state her case for likelihood of prevailing on the merits, Bonds must now show that the Smithsonian's proffered reasons for its adverse action are pretextual. This she can do.

First, Bonds raises a substantial red flag by the fact that the "competitive area" in which she works was unusually designed to cover only eight employees, an arrangement which gives her, an employee with 40 years of service at the Smithsonian, no seniority rights whatsoever in case of a reduction-in-force. The questionable way in which the reorganization plan was arranged gives her nowhere to go but out.

Second, defendant's claim that three employees—not only Bonds—lost their jobs due to the reorganization is deceiving. Three federal positions, one of which was held by Bonds, were, in fact, abolished—yet the oth-

er two employees holding federal jobs were immediately rehired as trust fund employees. One of the two was promoted upon rehire, as well. The Smithsonian's need to reorganize the Postal Museum—a need it deems "compelling"—resulted in a reorganization of one: the plaintiff. In fact, the Smithsonian alleges the plan to institute a RIF is necessary "in order to avoid massive furloughs," but defendant's actions do not bear out its concerns.

Third, and perhaps most important to Bonds' illustration of pretext, lies in Bruns' shifting opinion of her work. Bruns, as Bonds' supervisor, referred to her in glowing terms in November of 1995 saying that "Pat [Bonds] has been vital to the success of the museum's operation in 1995. Ms. Bonds' ability to maintain spending within acceptable limits was essential." Def.'s Resp. to Req. for Admis., para. 51 at 107. He also indicated that Bonds may have "saved my life as a director." But within a few short months Bruns apparently found her useless—with all her work done by her subordinates or all her time spent on relatively unimportant tasks. Bruns did not discover Bonds' irrelevance to the Postal Museum until he was apprised of a pressing need to slash budgets, he alleges. But the museum's actual shortfall was around $3,000 in 1996 [though it was anticipated to be greater] yet any resulting shortfall guaranteed to be covered by the Museum of American History. It is true that subsequent shortfalls would not necessarily be covered, but the entire sequence of events as set forth in the factual record in this case, and the lack of any solid explanations for why affairs were so handled, indicates that Bonds is entitled to an inference that the Smithsonian's reasons for her RIF were pretextual.

Thus, with respect to the first element of a preliminary injunction, likelihood of prevailing on the merits, Bonds has easily cleared this hurdle.

b. *Irreparable Harm*

To be eligible for preliminary injunctive relief, a plaintiff must next show he will suffer irreparable harm absent such relief. This is true in the case of a request for an ordinary preliminary injunction. The government alleges, however, that the case at bar presents no ordinary injunction. Rather, the injunctive relief Bonds seeks will derail a reorganization plan by a government agency. This, the Smithsonian argues, requires a plaintiff to show more than simply "irreparable harm." Instead, any alleged irreparable harm to the plaintiff must be weighed against the government's interest in ordering its own internal affairs. Def.'s Opp. to Pl.'s Emerg. Mot. for Leave to Cond.Exped.Disc. at 6–7. The Smithsonian contends that the government's interest in controlling personnel decisions coupled with the greatly expanded opportunity for plaintiff to receive monetary damages should obviate Bonds' ability to receive injunctive relief.

In response, plaintiff cites a number of examples where other federal courts have issued preliminary injunctions against the government preventing forced retirement, ordering reinstatement, and stopping transfers. Plaintiff argues that it is possible for her to obtain injunctive relief not only to prevent injury to her but also to prevent a chilling effect her termination might have on other employees who might consider filing complaints against the Smithsonian. Furthermore, Bonds asserts that because this is a claim of discrimination, whatever interest the government has in its autonomy over personnel decisions is compromised by the important policy interests in creating a discrimination-free workplace. This important question has never been answered head-on by this Circuit.

In *Sampson v. Murray,* the Supreme Court was asked to address whether injunctive relief was available at all when a government employee was wrongfully discharged. 415 U.S. 61, 69, 94 S.Ct. 937, 942–43, 39 L.Ed.2d 166 (1974). Prior to *Sampson,* there was a powerful tradition of judicial deference to governmental employment decisions. *See, In Keim v. United States,* 177 U.S. 290, 20 S.Ct. 574, 44 L.Ed. 774 (1900) (holding the Court of Claims without jurisdiction to award damages for wrongful termination of a federal employee); *White v. Berry,* 171 U.S. 366, 18 S.Ct. 917, 43 L.Ed. 199 (1898) (denying an injunction preventing dismissal of an employee who claimed termination based on political

affiliation); *Sawyer's Case,* 124 U.S. 200, 8 S.Ct. 482, 31 L.Ed. 402 (1887) (holding that a court of equity had no jurisdiction over the appointment and removal of public officers). But, "much water has flowed over the dam" since those days, and in *Sampson,* the Court ruled that there were cases where preliminary injunctive relief would be available to government employees. *Sampson,* 415 U.S. at 80–81, 94 S.Ct. at 948–49. Nevertheless, the *Sampson* Court cautioned that:

> [t]he District Court, in exercising its equitable powers, is bound to give serious weight to the obviously disruptive effect which the grant of the temporary relief [is] likely to have on the administrative process. When we couple with this consideration the historical denial of all equitable relief by the federal courts in cases such as *White v. Berry,* the well-established rule that the Government has traditionally been granted the widest latitude in the 'dispatch of its own internal affairs' and the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee, we think that the Court of Appeals was quite wrong in routinely applying to this case the traditional standards governing more orthodox 'stays.' *Id.* at 83–84, 94 S.Ct. at 949–50.

Rather, the Court stated a plaintiff must "at the very least" make a showing of irreparable harm which could overcome, both in kind and by degree, the factors which weigh against preliminary injunctions in the government employment setting. *Id.* at 84, 94 S.Ct. at 950. In fact, *Sampson* requires an "extraordinary case" whose circumstances "so far depart from the normal case" of injury to a discharged employee that the grant of injunctive relief would be appropriate. *Id.* at 92 n. 68, 94 S.Ct. at 953 n. 68. Insufficiency of savings or difficulty in obtaining employment "will not support a finding of irreparable injury, however severely they may affect a particular individual." *Id.* Instead, it is the truly remarkable case which would give rise to the court's equitable powers.

To be sure, *Sampson* dealt with a probationary employee who enjoyed considerably less protection than tenured employees with additional Civil Service protection.[4] The government, however, here argues that *Sampson*'s language is broad enough to cover *all* federal personnel cases. Def.'s Opp. to Pl.'s Emerg.Mot. for Leave to Cond.Exped.Disc. at 6. *Sampson*'s unequivocal, general language, and its expression of policy concerns suggests that the Court was speaking of all federal employees, not simply probationary employees or those with limited safeguards.

But Bonds insists that Title VII's vital protections against discrimination cut against any effort to require a heightened showing of damages, and though this issue was not considered by the *Sampson* court, Bonds points to a number other courts suggesting that *Sampson* is inapplicable to cases involving discrimination.[5]

■ Our circuit has thus far avoided addressing this question. *See Wagner,* 836 F.2d 566, 575 n. 66 (1987) (stating, "we need not address the question whether a higher standard is required in such instances"); *Callicotte v. Carlucci,* 698 F.Supp. 944, 949 (D.D.C.1988) (noting that this issue remained unresolved in this Circuit); *McElrath v. Kemp,* 714 F.Supp. 23, 26 (D.D.C.1989) (indicating the failure of this Circuit to answer the question of higher standards in such cases). But this issue must be addressed now, as it is clear Bonds would succeed in obtaining an injunction under the ordinary preliminary injunction standard. The government's contention that a higher standard of injury is required in federal employment cases must now be seriously examined to

4. "We are dealing in this case not with a permanent Government employee, a class for which Congress has specified certain substantive and procedural protections, but with a probationary employee, a class which Congress specifically recognized as entitled to less comprehensive procedures." *Sampson,* 415 U.S. at 80–81, 94 S.Ct. at 948 (footnote omitted).

5. It does not appear that any court has explicitly stated that *Sampson* is inapplicable to discrimination claims against the federal government, but a few courts have suggested that is the case, as discussed below.

determine if Bonds is still entitled to injunctive relief. This court finds that a more stringent showing of irreparable injury is required when a plaintiff, even in a Title VII case, seeks a preliminary injunction against the federal government in the personnel arena.

There is no doubt that Title VII presents a vigorous challenge to the government's interest in unfettered autonomy over employment decisions. But a non-analytic approach which reflexively places Title VII above all other interests is inappropriate.

Plaintiff must, therefore, establish that with respect to equitable relief, civil rights claims take precedence over the government's interest in making personnel decisions. Plaintiff suggests that protecting employees from retaliation, coupled with the chilling effect terminations could have on potential claimants, necessitates the issuance of a preliminary injunction even against the federal government. Plaintiff indeed makes a strong argument. Though *Wagner* failed to reach this issue because its plaintiff could not maintain even a garden-variety claim for injunctive relief, it nevertheless staked out the "particularly compelling" need to ensure the integrity and effectiveness of Title VII when there are allegations of reprisals, and noted "[t]he indispensable role of interim injunctive relief in achieving the goals of Title VII ..." 836 F.2d at 573–74. This is especially significant because "[r]etaliation threatens the very core of Title VII's guarantees, for it may well dissuade employees from ventilating their grievances." *Id.* at 574.

A most poignant address of the federal interest/Title VII interest dilemma comes in *Garcia v. Lawn,* 805 F.2d 1400 (9th Cir. 1986), where a Drug Enforcement Administration officer who had won a Title VII decision in 1983, sued in 1985 for enforcement of that ruling, and was immediately transferred from Los Angeles to Detroit. He asked for interim injunctive relief to block the move. *Id.* at 1401. The district court, after examining the traditional factors for injunctive relief, concluded the plaintiff would be eligible if he were a private employee, but as his suit was against the federal government, he would not prevail under *Sampson*'s required higher showing. The United States Court of Appeals for the Ninth Circuit, after determining that retaliation's "chilling effect" presented an injury for which injunctive relief might be granted, remanded the case, asking the district judge to determine if the plaintiff would now meet *Sampson*'s standards.[6] *Id.* The Ninth Circuit never decided whether or not *Sampson* would apply to Title VII cases, but plaintiff argues that *Garcia* challenges *Sampson*'s principles, and that *Garcia*'s criticisms of Sampson are applicable here.

*Garcia* does raise the suggestion that *Sampson* might not be applicable in the civil rights setting. First, the court proffers that Title VII already severely constricts governmental personnel decisions, indicating that Title VII by its very nature supersedes federal employment interests, and second, that Congress "expressed an intent to make all remedies that are available to employees of private employers available also to employees of the federal government." *Id.* at 1404. Thus, *Garcia* implies that *Sampson*'s recognition of the federal government's freer hand in employment determinations may not apply where Title VII is concerned, and certainly not where the alleged action is retaliatory.

These points fall flat, however. First, simply because Title VII makes inroads into the government's authority over personnel actions does not mean that availability of injunctive relief is an insignificant outgrowth of that intrusion. Injunctive relief is by its very nature an extreme invasion of an employer's prerogatives, and must be considered carefully. Second, the fact that there may be an intent by Congress, though not explicitly stated in the statute, to provide injunctive relief in federal cases identical to that available in private suits ignores the

6. The Ninth Circuit's actual holding, that the "chilling effect" retaliation might have on other employees must be considered by the district court as a non-economic harm, does not necessarily conflict with *Sampson's* holding. In fact, *Garcia* distinctly indicates that upon remand "the plaintiff in this case may well meet *Sampson's* standards." *Garcia,* 805 F.2d at 1406. Thus, the court did not actually reach the issue, but simply gave some reasons why *Sampson* may not be applicable in the Title VII context.

historical context into which equitable relief against the government has been traditionally disfavored.[7, 8]

In reality, most courts have applied *Sampson* to a full range of federal employment decisions. In *Gilley v. United States,* 649 F.2d 449, 454–55 (6th Cir.1981), the Sixth Circuit clearly determined that, "[t]he Supreme Court has established standards for judging claims of irreparable harm in federal personnel cases which are more stringent than those applicable to other classes of cases." *Id.* at 454 (*citing Sampson*). The court continued that *Sampson's* rule was applicable to "all cases where federal employees seek district court injunctive relief prior to completion of their administrative appeals." *Id.* While *Gilley* arose in the context of applying *Sampson* to tenured federal employees as well as probationary ones, its decision is clearly broad enough to encompass different causes of actions as well.[9]

A powerful example of a court's unwillingness to provide injunctive relief in a civil rights context is *Stromfeld v. Smith,* 557 F.Supp. 995 (S.D.N.Y.1983). There, the district court refused to grant a preliminary injunction enjoining a Drug Enforcement Administration agent's transfer from New Jersey to Miami, a transfer the agent alleged was done in retaliation for a civil rights claim filed with the Merit Systems Protection Board—which he won. The court stated: "[a] federal employee challenging the action of a federal agency, however, must establish a higher degree of harm [than the ordinary preliminary injunction standard requires]. The moving party must show that 'extraordinary' harm will result if interim relief is denied." *Id.* at 998. The court continued that, "[t]his stringent standard accommodates the judiciary's well-founded reluctance to interfere with the government's personnel decisions." Notably, the harm to the plaintiff in *Stromfeld* far exceeded anything alleged in the case here at bar, yet, an injunction was not issued.[10, 11]

7. See discussion of *Sampson* below.

8. This court is also aware of cases in this very district which have suggested that *Sampson* should not apply to causes of action arising from civil rights laws. See, *McElrath,* 714 F.Supp. at 27 (stating, "I am not persuaded that a higher standard should apply in actions brought pursuant to the civil rights laws. Nevertheless, I need not resolve this issue because plaintiff has satisfied her burden under either standard."); *Callicotte,* 698 F.Supp. at 949 (determining that, "[w]hile the Court is not persuaded that the higher standard should apply in actions brought under the civil rights laws, it need not resolve the issue for purposes of this litigation because the plaintiff has satisfied her burden under either standard.") Neither of these cases actually reached the issue, and neither supplied any reasoning whatsoever for such statements.

9. This proposition was criticized by *Gately v. Commonwealth of Massachusetts,* 2 F.3d 1221, 1233 (1st Cir.1993), where the court stated its belief that applying *Sampson's* "genuinely extraordinary" test to all employee discharge cases "whatever the asserted basis for relief" was an "overly broad and faulty" interpretation of *Sampson's* holding. *Id.* But *Gately* dealt with a situation where an employee had no administrative remedies available. It thus did not hold him to "the same exacting standard required of the plaintiff in *Sampson,*" but still required that the plaintiff "clearly must establish irreparable harm, and point to factors sufficient to overcome 'the traditional unwillingness of courts of equity to enforce contracts for personal services'" *Id.* (*citing Sampson*). Furthermore, the First Circuit itself, as *Gately* recognized, applied a *Sampson*-like rule in a private Title VII action in *Bailey v. Delta Air Lines, Inc.,* 722 F.2d 942 (1st Cir.1983) where the court ruled that "[a]t minimum, an aggrieved person seeking preliminary relief outside the statutory scheme for alleged Title VII violations would have to make a showing of irreparable injury sufficient in kind and degree to justify the disruption of the prescribed administrative process and overcome the reluctance to enforce personal service contracts in equity." *Id.* at 944.

10. In addition to the "obvious" hardships a transfer from New Jersey to Florida would entail, the Stromfelds faced difficulties in selling their home and high interest rates—which could be compensated with money. However, Mrs. Stromfeld suffered four miscarriages since her husband filed his first EEOC complaint, and their son had considerable trouble adjusting to the family's previous move. The court stated that though he was sympathetic to their plight, this sympathy "does not justify a finding of irreparable harm sufficient to warrant an injunction." *Id.* at 999.

11. In *E.E.O.C. v. Chrysler Corp.,* 546 F.Supp. 54, 70 (E.D.Mich.1982) *aff'd* 733 F.2d 1183 (6th Cir. 1984), plaintiffs RIFed by Chrysler sued for reinstatement. The district court apparently applied *Sampson's* heightened standard—suggesting that

The need to root out invidious discrimination from the workplace is clearly as important in the public workplace as it is in the private sector. But this does not mean that courts should be as willing to exercise their equitable powers to accomplish this on an interim basis. *Sampson* itself makes this clear. *Sampson,* though permitting judicial intervention in certain cases, found the historic importance of judicial restraint in the sphere of governmental employment compelling, thus requiring an "extraordinary case" before granting interim injunctive relief. *Sampson's* reliance upon *White v. Berry* in support of this limiting principle on injunctive interference in the federal employment regime lays the groundwork for dealing with Title VII.

In 1893, H.C. Berry was a gauger for the federal government when A.B. White, a collector of internal revenue announced his decision to remove Berry and have others fill his position. *Berry,* 171 U.S. 366, 366–67, 18 S.Ct. at 917 (1898). Berry, a Democrat, alleged that both his firing and White's intentions to appoint one of four Republicans to take Berry's place was a decision based solely on political reasons. Berry contended that Civil Service Act, which forbade any dismissals for "political or religious affiliations" was violated, and that he was entitled to an injunction to prevent his removal. *Id.* at 368–69, 18 S.Ct. at 917–18. The Circuit Court of the United States for the District of West Virginia granted the injunction. The Supreme Court reversed. The great weight of authority, both American and English, supported the rule that "a court of equity will not, by injunction, restrain an executive officer from making a wrongful removal of a subordinate appointee...." *Berry,* 171 U.S. at 377, 18 S.Ct. at 921, *citing Morgan v. Nunn,* 84 F. 551, 553 (1898). Though *Sampson* buried this absolute rule, it nevertheless maintained its general distaste for issuing injunctions in the federal employment context—and by looking specifically to *Berry*—ultimately concluded that "the widest latitude" be given the Government in the "dispatch of its own internal affairs."[12] *Sampson,* 415 U.S. at 83, 94 S.Ct. at 949 (citations omitted). *Berry* dealt with invidious political discrimination, striking at the heart of 19th century civil service reform. Yet, *Sampson,* in pronouncing a heightened standard for injunctive relief against the government, looked to that very decision in the development of its "extraordinary case" rule. As *Berry* involved invidious discrimination, albeit political rather than racial, it appears that *Sampson's* rule would be applicable in other civil rights contexts as well, including Title VII.

Equitable relief is by no means foreclosed to plaintiffs seeking injunctions against the federal government. It is now only more difficult to obtain. It is true that there will always be a fine line between "irreparable injury" and "extraordinary irreparable injury," but there is—must be—a difference, and in cases of truly severe irreparable injury, a party may obtain relief.

In addition to a showing of "extraordinary" injury, this court hastens to add that a plaintiff who demonstrates that an adverse per-

Sampson may reach even beyond the federal government context—and, in fact, found that emotional stress, increased drug use, depression, etc. suffered by terminated employees constituted irreparable harm which "depart[ed] from the normal case" and was enough to grant an injunction. Every injunction proceeding where injury must be shown requires, of course, a fact specific inquiry. Simply because an individual suffers a non-economic injury does not mean there is irreparable injury. Bonds claims that her injury is similar to that of plaintiffs in *Chrysler,* and that "[t]erminating Ms. Bonds would do far more than cause her a monetary loss; it would end a career with the Smithsonian [in] which she has invested her entire working life." Pl.'s Reply to Def.'s Opp. to Mot. for Prel.Inj., Jan. 3, 1997 at 22. Whether this would be considered "extraordinary" will be discussed below.

12. It is important to remember that even in non-federal or private regimes the disaffection of the courts toward awarding injunctions in employment cases is strong. See, e.g., *O'Connor v. Peru State College,* 728 F.2d 1001, 1003 (8th Cir.1984) "An outright grant of preliminary relief in employee discharge cases defeats the employer's prerogative of discharge.... This is not to say that preliminary relief should never be granted in an employment discharge case. Rather, we merely note that in the present case the circumstances of discharge demonstrate that the balance of equities lies with the employer, and that O'Connor has not demonstrated sufficient factors to offset the balance."

sonnel action is likely to have a chilling effect on other employees who, after witnessing their fellow co-worker's discharge or dismissal, would now refuse to file claims in fear of reprisals, would also meet *Sampson's* barrier. This incorporates *Garcia's* concerns while at the same time maintains the government's autonomy over employment decisions.[13] Indeed, this court has issued injunctions against at least one state agency which would rise to *Sampson's* dictates.[14]

But in the case at bar, defendant argues that if forced to retain Bonds, her only remaining task would be to receive a paycheck; she would have no job to perform, it having been eliminated. The Smithsonian emphasizes that she can be awarded compensatory damages, should she prevail at trial, making her whole for any emotional, physical, or mental distress her termination may cause her. So, defendant asserts, even if she has suffered injury, there is certainly nothing extraordinary about it.

After a careful analysis of the facts of this case, the court finds that plaintiff meets the extraordinary *Sampson* standard. The fact of the matter here is that the Smithsonian will be RIFing a 58 year-old woman who has worked for the Smithsonian for nearly 40 years. She has no college education, and worked her way up from a typist to a program analyst—attaining a high level position with substantial responsibility. But should she be terminated, it is unlikely she could ever find work approaching what she now does, if she could find work at all. It is telling that Bonds has tenaciously fought not only stay employed but to be promoted as well given her age and tenure. As things now stand, she is entitled to almost 80 percent of her "high three" average salaries should she retire now. She would also retain her health and life benefits. The government argues this cuts against a finding of irreparable injury. Def.'s Opp. to Pl.'s Mot. for a Prel.Inj., December 23, 1996 at 46 n. 20. To the contrary: rather than leave her job, Bonds has chosen to work, where she maintains a high level of job performance, according to her performance ratings. The fact that she could retire and be nearly as well off financially without having to lift a finger, shows just how much of her life is tied into her career. Rather than merely proffering or alleging injury to her livelihood, Bonds has demonstrated it by her very actions.

The court does not, however, believe that any stigma would result from her RIF—given the increasing frequency with which employees are eliminated in a time of heavy budget cuts—nor is it likely that a "chilling effect" would result from her termination, as no real evidence has been offered to support such an argument. But Bonds' injuries are severe enough that she can surmount *Sampson's* hurdle, nonetheless.[15]

c. *Harm to Other Parties*

Even though Bonds is likely to succeed on the merits and she is likely to suffer

13. This decision also incorporates the Second Circuit's ruling in *Holt v. Continental Group, Inc.*, 708 F.2d 87 (1983), a case commonly, and mistakenly, cited as rejecting *Sampson's* rule in discrimination cases. In *Holt*, the court merely indicates that retaliation may constitute irreparable harm, and that a district court must determine if the effects of an alleged retaliatory action could constitute irreparable injury. *Id.* at 91. As *Holt* arose in the context of private employment, *Sampson's* added stringencies would not be applicable, and ordinary irreparable injury would be enough. When the federal government is involved, however, the heightened standard applies, and a plaintiff alleging that her discharge would chill other potential plaintiffs must show that this intimidation is likely, and that when combined with any other harmful circumstances, if any, would be extraordinary.

14. By way of example only, and without deciding that state agencies are entitled to the same protection against injunctions as the federal government, this court witnessed such rampant discrimination, harassment, and retaliation in *Bessye Neal v. District of Columbia Department of Corrections*, 93–2420 (D.D.C. filed Nov. 24, 1993) that it ordered reinstatement of several Department of Corrections employees and forbade the dismissal of others. Civil rights concerns overwhelmed the state administrative interest in independence in employment decisions and truly rose to extraordinary dimensions.

15. The court also notes that the statutory cap on compensatory damages means that Bonds could never recover fully for her injuries, should they exceed that amount. While the existence of a statutory damages cap should obviously not allow for the carte blanche awarding of injunctions, in this case it makes her injury that much more irreparable in light of the facts surrounding her RIF.

extraordinary irreparable harm if no injunction should issue, the court must also weigh any harm the Smithsonian might suffer as a result of the court's granting this equitable relief. The Smithsonian states that it "cannot ignore its responsibility to improve operations," and the issuance of an injunction allowing Bonds to retain her job during the pendency of her suit would harm the reorganization plan, blocking the Postal Museum's ability to "carry out its mission most effectively." Def.'s Opp. to Pl.'s Mot. for Prel. Inj., Dec. 23, 1996 at 50. On the facts of this case, these statements prove empty. The Smithsonian argues it has nothing for Bonds to do, now that her position has been eliminated, and an injunction would simply force it to pay her a hefty salary to sit and do nothing. But does she really have nothing to do? Would refusing to utilize any services she may offer really be in the best interests of the Smithsonian carrying out its mission most effectively?

This court agrees that the government should be given wide latitude to manage its internal affairs, as indicated in the court's discussion of *Sampson.* Therefore, the court will not command the Smithsonian to make best use of her skills, or even make any use of her skills. But at the same time, when calculating the harm the government will suffer if it is forced to keep Bonds on the payroll, the court is entitled to examine whether harm to the government is a necessary result or a contrived one. The Smithsonian could choose to detail her from the Postal Museum to another area where there would be work, or it could use her for a variety of other internal tasks. Or, if it so chooses, the Smithsonian could choose to place Bonds on administrative leave from which the Smithsonian will, indeed, derive absolutely no benefit. This decision is left to those in-the-know at the Smithsonian. But the government cannot exacerbate its own harm, then seek to use that excuse to defeat the plaintiff's case for injunctive relief.[16] Any harm to the government as a result of the issuance of a preliminary injunction is substantially outweighed by the other factors to be balanced.

d. *Public Interest*

The final determination a court must factor into the balance of interests in the decision to grant a preliminary injunction is whether the public interest favors such relief. The government argues that "[i]f the Court were to grant injunctive relief in this case, it would establish a very harmful precedent in federal personnel cases involving reorganizations within agencies for the sake of efficiency. To order injunctive relief under the circumstances of this case would curtail agency flexibility, and thus deter efforts to try to fashion solutions to duplicative operations." Def.'s Opp. to Pl.'s Mot. for Prel.Inj., Dec. 23, 1996 at 51.

Generally speaking, the Smithsonian's concerns are well-placed, and today this court has, in fact, added to the government's autonomy and flexibility by making it more difficult for employees to seek preliminary injunctive relief in personnel decisions. The court takes seriously *Sampson's* extraordinary irreparable injury standard, and finds its challenging hurdle applicable even in the most sympathetic of settings—cases where an employee has alleged impermissible discrimination.

But this rule of law cannot exist in a vacuum devoid of facts. The public interest does not favor courts forcing the government to retain deadweight employees, nor does it favor having employees sit at home watching *Oprah* and munching Cheetos at public expense. But neither of these examples ring true in this case. We are here presented with a truly extraordinary situation, fraught

16. Notably, the Smithsonian placed Bonds on administrative leave back in early November, 1996, when this court issued a temporary restraining order. She has remained on leave ever since then. Bruns, who made the decision to place her on administrative leave states that this decision is "distressing to me, and harmful to the Smithsonian, as well as taxpayers," but maintains he "had no choice but to place her on administrative leave"—there is no work for her to do. Bruns Decl., Def.'s Opp. to Pl.'s Mot. for Prel.Inj., Dec. 23, 1996, Exh. 1 at 14. The court seriously doubts that he had "no choice," but it is his prerogative to make such a determination, and if the powers that be at the Postal Museum desire to waste their own money by maintaining this policy until trial, that is their prerogative as well.

with remarkable, if not questionable, organizational and managerial decisions. It is surprising, based on the record before the court, that the Smithsonian has gone to such lengths to terminate an employee who actually has shown a willingness to work and to do so competently—perhaps an unusual combination in the federal bureaucracy. The public interest favoring governmental independence in employment decisions does not overwhelm her ability to receive injunctive relief in this case.

### 3. CONCLUSION

After weighing carefully the relevant factors for the issuance of preliminary injunctive relief, the court finds plaintiff Bonds is is entitled to a preliminary injunction preventing the Smithsonian from executing its plan to terminate her employment. Given her likelihood of success, her extraordinary level of injury, and the balance of interests, a preliminary injunction is an appropriate form of relief.

A separate order shall issue forth this date.

### ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby ORDERED that

Plaintiff's motion for partial summary judgment is DENIED; and it is further ORDERED that

Defendant's motion to dismiss and for summary judgment is DENIED; and it is further ORDERED that

Plaintiff's motion for a preliminary injunction is GRANTED; and it is further ORDERED that

Defendant shall be barred from terminating the employment of Ms. Bonds, pending further Order of the Court.

SO ORDERED.