*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 21-CV-0448

CHRISTIAN GREENE, APPELLANT,

V.

DISTRICT OF COLUMBIA
CHILD & FAMILY SERVICES AGENCY, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(2018-CA-002741-B)

(Hon. Florence Pan, Motions Judge)

(Argued November 28, 2023                    Decided September 12, 2024)

*F. Douglas Hartnett*, for appellant.

*Holly M. Johnson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia (at the time of argument), *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General were on the brief, for appellee.

*Tom Devine*, of the Government Accountability Project, filed a brief as *amicus curiae*.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and BECKWITH and DEAHL *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: The District of Columbia Child & Family Services Agency ("CFSA") terminated the employment of its Ombudsman, Christian Greene, who then filed suit against the District claiming that her termination violated the District of Columbia Whistleblower Protection Act ("WPA"). On appeal, Ms. Greene seeks review of the trial court's grant of summary judgment to the District. The trial court did not address whether Ms. Greene reasonably believed that her disclosures revealed unlawful activity at CFSA or whether the evidence established a causal connection between her allegedly WPA-protected conduct and her termination. Instead, the trial court found that Ms. Greene's disclosures were actually policy disagreements about the role of the Ombudsman at CFSA and were thus not protected under the statute. Ms. Greene argues that the trial court overlooked evidence in the record showing that at least some of the instances she highlighted constituted WPA-protected disclosures. We hold that Ms. Greene's disclosures were protected under the WPA. Because we conclude that Ms. Greene's disclosures were WPA-protected, we reverse, in part, the trial court's grant of summary judgment on the basis that Ms. Greene's disclosures were mere policy disagreements. In light of our holding, we remand the case for the trial court to determine whether there is a genuine dispute of material fact that Ms. Greene's disclosures were a cause of her termination.

## I.  Factual[1] and Procedural Background

### A. FYAA and CFSA Ombudsman Role

The following facts are taken from the record before us, including Ms. Greene's affidavit, which we review in the light most favorable to Ms. Greene as the nonmoving party. *See, e.g., Hsieh v. Formosan Assoc. for Pub. Aff.* 316 A.3d 448, 453 (D.C. 2024).  Ms. Greene began work for CFSA in 2009, as a Child Protective Services Investigator.  Ms. Greene became Ombudsman at CFSA in March 2015, a role formed in the wake of the Foster Youth Statements of Rights and Responsibilities Amendment Act of 2012 ("FYAA"), Foster Youth Rights Amendment Act of 2012, D.C. Act 19-640, 60 D.C. Reg. 2060 (January 23, 2013) (adding Title III-C to D.C. Code §§ 4-1301.01-06.01), which required CFSA to enforce the rights of foster youth and to establish a "mechanism" for receiving and handling complaints made by youth or on their behalf.  D.C. Code § 4-1303.72-74. The FYAA did not specifically require CFSA to have an Ombudsman on staff, but

---

[1] Ms. Greene's statement of facts refers us to her seventy-page affidavit for "the most comprehensive and documented reciting of the facts."  The District argues that Ms. Greene's attempt to incorporate her affidavit into her statement of facts is impermissible in violation of the opening brief's fifty-page limit.  D.C. App. R. 32(a)(6).  While it is true that briefs cannot exceed fifty pages, we must consider on appeal of a summary judgment ruling "the entire record in the light most favorable" to Ms. Greene.  *See, e.g., Samm v. Martin*, 940 A.2d 138, 140 (D.C. 2007). Ms. Greene's affidavit is part of the record, and we reference it in our review.

the assistant general counsel who represented CFSA when the FYAA was drafted and passed agreed with Ms. Green in a February 3, 2016, conversation that the Ombudsman was the agency's designated "mechanism" under the FYAA. In part, the Ombudsman's role at CFSA was to independently investigate complaints and to review CFSA actions and decisions to ensure compliance with relevant law, rules, and regulations. The FYAA also required that CFSA report to the D.C. Council the number of contacts made to the agency, the number of concerns reported, the number of investigations performed, and the "trends and issues that arose in the course of investigating concerns and outcomes of the investigations conducted." D.C. Code § 4-1303.74(b)(3).

CFSA's description of the role described the Ombudsman's responsibility to "[r]eview[] CFSA and/or private agency actions and decisions to determine whether they comply with laws, rules and CFSA policies." Several years before Ms. Greene became Ombudsman, CFSA's professional standards policy document highlighted the agency's commitment to addressing external concerns, emphasizing that "the Ombudsman shall conduct a fact-finding review and analysis of the identified concern to determine whether [CFSA] has violated any law, policy, standard of practice or procedure, or whether [CFSA] has unreasonably exercised its authority."

**B. Early Reports of FYAA Violations**

After months of relying on the practice standards set out by her predecessor, Ms. Greene reviewed the FYAA legislation for the first time on February 1, 2016. She immediately gleaned that CFSA was not in compliance with FYAA, and she reported the violations to her superior, Director Davidson, highlighting the relevant FYAA provisions, that same day. Ms. Greene also pointed out to Director Davidson that the 2015 Trend Report—written by the Youth Ombudsman, a separate position—misrepresented CFSA's implementation of the statute. Director Davidson agreed to review her noted concerns.

Ms. Greene sent Director Davidson, a deputy director, and General Counsel Cory Chandler a proposed policy on February 16, 2016, that would consolidate and formalize the Ombudsman office and ensure CFSA's FYAA compliance. This proposal built on her prior recommendations, approved by Director Davidson, to move the Youth Ombudsman's office under her supervision. Ten days later, Ms. Greene met with the Human Resources Director to update her position description to include management to make the role more in line with national and international standards. CFSA solicited applications for the updated position, requiring Ms. Greene to apply in order to remain Ombudsman. Ms. Greene was selected for the updated position on March 25, 2016.

On April 25, 2016, Director Davidson, in consultation with senior leadership, moved the Ombudsman position from under his own supervision to that of Ms. Chandler.  Ms. Greene asked Director Davidson to reconsider and detailed her concerns that the move was an attempt to silence and control her investigations because the general counsel's office, mandated to represent the interests of the agency, would hinder her ability to be impartial and ensure confidentiality. Ms. Chandler, in correspondence with Director Davidson, shared her disagreement with Ms. Greene regarding the role of the Ombudsman.  In an attempt to clarify the Ombudsman position, Ms. Chandler initiated a policy workgroup to further discuss and develop the role.

In a December 1, 2016, performance evaluation, Ms. Chandler rated Ms. Greene as a "Valued Performer" (3 out of 5) on her communication and "Highly Effective" (3.8 out of 5) overall, noting that "[f]or the most part, [Ms. Greene's] communication is clear and understandable" and that Ms. Greene "effectively adjusted her communication style in order to ensure that ideas and information were presented in clear and concise fashion."

## C.      Discrete Disclosures

On appeal, Ms. Greene identifies six disclosures that she argues were protected under the WPA: related meetings on September 15, her response to a supervisor's

directive to use an intake form, an email to the interim director, and three disclosures related to the drafting and editing of the 2016 Trend Report.

### 1.    September 15 Meetings

In a private meeting with Ms. Chandler on September 15, 2016, Ms. Greene discussed how she planned to enforce the FYAA, including reporting on "outcomes" of investigations as required by the law.  Ms. Greene underscored that reporting such outcomes was especially necessary in cases where improper conduct might not rise to a level of seriousness meriting a police or Child Protective Services report, and would thus otherwise go undocumented.  Additionally, Ms. Greene stated that in response to her raising arguments on this point, she "was often told to 'lift off paper'—which was internal CFSA terminology meaning to not formally record or have a written record of findings."

Later that day, both Ms. Chandler and Ms. Greene attended a CFSA-hosted meeting with foster-system stakeholders.  When a meeting participant asked if CFSA issued findings when it was accused of retaliating against youth or foster parents who complained about the agency, Ms. Chandler stated that it did.  Ms. Chandler then looked to Ms. Greene for confirmation, but Ms. Greene instead stated that the Ombudsman did not issue findings of rights violations by CFSA under the current system and that she hoped to change that moving forward.  According to

Ms. Greene, Ms. Chandler seemed angry after the meeting, and told Ms. Greene that she needed a break from her—both Ms. Chandler and Ms. Greene agreed to avoid communication for a few days.

### 2. Intake Form

On September 14, 2016, the day before the stakeholder meeting, Ms. Chandler proposed that Ms. Greene use an intake form to streamline the process for making and resolving complaints. Ms. Greene understood the intake form as requiring her to report the names and details of complaints to the managers of CFSA staff against whom such complaints were made. Ms. Greene responded that the form would thus put all parties, including the person mentioned in the complaint, on notice and chill reports to the Ombudsman. To illustrate her concerns, Ms. Greene detailed case examples from her work where she believed putting parties on notice of a complaint would hinder her investigations. The cases she recounted included descriptions of CFSA's "non-adherence or enforcement of DCMR licensing standards," CFSA employees failing to timely report abuse allegations as legally mandated reporters, and interference with Ms. Greene's access to documents in a case of alleged medical neglect where a CFSA-contractor agency placed special needs children with unlicensed foster parents.

After Director Davidson resigned, Deputy Mayor Brenda Donald began serving as Interim Director of CFSA. Ms. Chandler informed Ms. Greene that Interim Director Donald requested monthly reports and that Ms. Greene was "expected to use the intake form going forward." Ms. Greene responded on October 28, 2016, that she would only comply if she received assurance from CFSA's General Counsel that the intake form was a directive from Interim Director Donald that was in compliance with the FYAA and CFSA's other legal obligations.

### 3. Email to Interim Director

On November 7, 2016, Ms. Greene emailed Interim Director Donald directly with a request to meet. Attached to the email was 150 pages of documents that included the response Ms. Greene had previously sent to Ms. Chandler detailing CFSA misconduct and the earlier email she had sent Director Davidson with the research that led, in part, to the re-drafting of the Ombudsman position.

### 4. 2016 Trend Report

As 2016 drew to a close, Ms. Greene began work on the annual Trend Report. Ms. Greene was not able to send the first draft by the January 6, 2017, due date; instead, she submitted a partial report on January 12 and the completed report on

January 18. She informed her superiors ahead of the original deadline that she would do her best to meet the deadline but that she would likely need more time.

On January 5, 2017, while still drafting the 2016 Trend Report, Ms. Greene and the Youth Ombudsman under her supervision discovered that CFSA was not distributing documentation of youth rights to children entering the foster system, as required under the FYAA. D.C. Code § 4-1303.73(a). The next day, Ms. Greene met with Ms. Chandler and another supervisor about the Trend Report and informed them of the distribution of rights violation.

The initial draft of the report described the complaints received by the Ombudsman's office and the results of the corresponding investigations. Noting that the Ombudsman's office had received 321 complaints in 2016 after having noted only forty-two in the 2015 Trend Report, the draft revealed that CFSA had provided 2015 data only for youth aged fifteen to twenty-one rather than for youth of *all* ages under twenty-one as the FYAA requires. D.C. Code § 4-1303.71. The draft also included descriptions of trends at CFSA that violated the agency's legal or policy obligations, including, among others: improper use of CFSA's case management system resulting in inconsistent records of foster children, failure to report suspected abuse and neglect as mandated by law, and withholding records from youth formerly under CFSA's care in violation of the FYAA. D.C. Code § 4-1303.72(b).

Soon after submitting her first draft, Ms. Greene received comments from her superiors. Her managers—namely Ms. Chandler and Chief of Staff Rachel Joseph—edited and removed large portions of the draft to an extent that Ms. Greene characterized in response as hiding misconduct and violating the FYAA's mandated reporting on investigation "outcomes." The back and forth—rounds of significant edits that Ms. Greene resisted—continued for several weeks. Ms. Greene's managers repeatedly asked her for access to the underlying data for the report, which Ms. Greene had agreed with former Director Davidson would be kept in a Google Document that only she and the Director could access. Ultimately, Ms. Greene rewrote the report and submitted a new draft on February 10, 2017.

On February 24, 2017, Ms. Greene escalated her complaints about the Trend Report editing process to newly appointed Director Donald, who called for a meeting with Ms. Greene and senior leadership. At the meeting, Ms. Greene reiterated her concerns that the edited version of the report erased all the "outcomes" that the FYAA required. At Director Donald's request, Ms. Greene followed up after the meeting by sending a combined version of the trend report that highlighted the edits made by Ms. Chandler and Ms. Joseph, but did not hear back from Director Donald directly. A March 27, 2017, version of the Trend Report removed references to almost all complaints from Ms. Greene's draft and removed the draft's discussion

of the trends that Ms. Greene had identified as violating CFSA's legal obligations and policies.

## D. Termination and Litigation

On April 24, 2017, CFSA notified Ms. Greene of her termination without cause and placed her on administrative leave, effective May 15, 2017. Ms. Greene sued CFSA, claiming that her termination violated the WPA.

During discovery, the parties agreed upon a list of forty different disclosures that Ms. Greene made as Ombudsman at CFSA. CFSA moved for summary judgment as a matter of law, arguing that none of the disclosures that Ms. Greene made was a protected disclosure under the WPA.

In an oral ruling from the bench the trial court granted CFSA's motion for summary judgment, finding that none of the disclosures was WPA-protected. The trial court reasoned that the vast majority of the agreed-upon forty disclosures were focused on structural issues regarding the role of the Ombudsman at CFSA and concluded that the disclosures were policy disagreements rather than protected disclosures.

This appeal followed.

## II.    Discussion

We review the grant of a motion for summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party from an independent review of the record.  *Ukwuani v. District. of Columbia*, 241 A.3d 529, 541 (D.C. 2020).  Summary judgment is only appropriate when there is no genuine issue of material fact, which requires more than allegations that are conclusory or unsupported.  *Id*. at 541-42.  We reverse where there is "any record evidence, after discovery, on which a jury could properly reach a verdict for the non-moving party." *Id*. at 541.

In order to make out a prima facie case of retaliation under the WPA, Ms. Greene must establish that (1) her disclosures were protected, and (2) there was a causal nexus between her protected disclosures and her termination.[2]  *Holbrook v. District of Columbia*, 259 A.3d 78, 85 (D.C. 2021).  The trial court granted CFSA's motion for summary judgment on the grounds that Ms. Greene's disclosures were

---

[2] In the alternative, Ms. Greene also argues on appeal that her termination was a violation of the WPA because she was perceived by her supervisors as being a whistleblower, citing to the Merit System Protection Board's interpretation of the federal whistleblower-protection statute.  *Schaeffer v. Dep't of Navy*, 86 M.S.P.R. 606, 617 ¶ 16 (2000) (a person "perceived as" engaging in protected disclosures, even if they are not, is entitled to statutory protection); *Special Counsel v. Spears*, 75 M.S.P.R. 639, 654-55 (1997).  Because we conclude that Ms. Greene's disclosures were WPA-protected, we decline to address her "perceived as" argument here.

policy disagreements and not WPA-protected conduct. In the alternative, the trial court also stated that the disclosures Ms. Greene identified, which Ms. Greene alleged contained reports of illegal conduct, "could not possibly be the causation" of her termination. We disagree and conclude that Ms. Greene's disclosures were protected under the WPA and that the record warrants further examination as to the reasons for her termination.

## A. Protected Disclosures Under the WPA

On appeal, Ms. Greene challenges the trial court's ruling as to only six of the forty disclosures that the parties addressed before the trial court. The six instances of disclosure are: (1) the September 15, 2016, private meeting with Ms. Chandler about reporting outcomes and the subsequent discussion at the stakeholders meeting; (2) the September 19, 2016, email Ms. Greene sent to Ms. Chandler about the intake form directive with a nine-page attachment describing CFSA violations of law and regulations; (3) the email Ms. Greene sent to Director Donald requesting a meeting and its 150-page attachment describing CFSA legal violations; (4) the 2016 Trend Report draft; (5) the March 9, 2017, meeting between Ms. Greene and her supervisors about the 2016 Trend Report; and (6) Ms. Greene's revisions to the trend report.

Under the D.C. WPA, a "protected disclosure" is defined as:

"[A]ny disclosure of information, not specifically prohibited by statute, without restriction to time, place, form, motive, context, forum, or prior disclosure made to any person by an employee or applicant, including a disclosure made in the ordinary course of an employee's duties by an employee to a supervisor or a public body that the employee reasonably believes evidences:

(A)    Gross mismanagement;

(B)    Gross misuse or waste of public resources or funds;

(C)    Abuse of authority in connection with the administration of a public program or the execution of a public contract;

(D)    A violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature; or

(E)    A substantial and specific danger to the public health and safety."

D.C. Code § 1-615.52(a)(6).

Ms. Greene contends that the six instances she raises on appeal are protected disclosures because they reveal "violation[s] of a federal, state, or local law, rule, or regulation," namely the FYAA, "which [are] not of a merely technical or minimal nature," D.C. Code § 1-615.52(a)(6)(D).[3]  An employee makes a WPA-protected

---

[3] Ms. Greene mentions or alludes to arguments that a number of her disclosures are also protected as exposing CFSA's "[g]ross mismanagement," "[a]buse of authority," or threats to public safety. *See* D.C. Code §§ 1-615.52(a)(6)(A),(C),(E).  Because we conclude that all six of Ms. Greene's disclosures are protected as violations of the FYAA, we need not

disclosure when they reasonably believe, "at the time the whistle was blown," *Freeman v. District of Columbia*, 60 A.3d 1131, 1143 (D.C. 2012) (emphasis omitted), that their employer's action falls under one of the statute's five categories. The determination of a disclosure's coverage under the statute "hinges not upon whether the [conduct] was ultimately determined to be illegal, but whether appellant reasonably believed it was illegal." *Freeman*, 60 A.3d at 1141 (quoting *Zirkle v. District of Columbia*, 830 A.2d 1250, 1260 (D.C. 2003)).

The trial court, which granted the District's summary judgment motion on the grounds that the alleged disclosures were policy disputes, did not grapple with considerable evidence demonstrating the reasonableness of Ms. Greene's belief that she was reporting CFSA conduct that was unlawful under the FYAA. The WPA is not meant to be "a weapon in arguments over policy or a shield for insubordinate conduct," *Johnson v. District of Columbia*, 225 A.3d 1269, 1275 (D.C. 2020) (internal quotation marks omitted) (quoting *Zirkle*, 830 A.2d at 1260), "and does not cover disclosures that are minor relative to the scope of the agency's work," *id*. (quoting *Williams v. Johnson*, 776 F.3d 865, 871 (D.C. Cir. 2015)). "A mere policy disagreement with an agency or supervisor is not enough" to warrant WPA protection; rather, an employee "must show that they had a reasonable and genuine

---

address her arguments as to whether they fall into additional categories under the WPA.

contemporaneous belief that the actions they disclosed rose to the level of seriousness required" under the WPA. *Id.* at 1276. We conclude that the record before us sufficiently demonstrates that Ms. Greene possessed a genuine contemporaneous belief that her disclosures revealed unlawful CFSA conduct that her belief as such was reasonable such that the grant of summary judgment was not warranted.

### 1.  Genuine Contemporaneous Belief

The record provides ample evidence for a factfinder to conclude that Ms. Greene believed her disclosures revealed illegal conduct on the part of CFSA, and the District does not contest the genuineness of Ms. Greene's beliefs. Ms. Greene's conduct also persuades us that she possessed a genuine contemporaneous belief that her disclosures revealed more than minimal violations of D.C. law. *See Johnson*, 225 A.3d at 1276 ("Plaintiffs who allege violations of law . . . must show that they had a reasonable and genuine contemporaneous belief that the actions they disclosed rose to the level of seriousness required under the DCWPA."). Ms. Greene persistently raised alarm bells in reports to her managers and stood by her beliefs that CFSA was not in compliance with the FYAA. At the September 15, 2016, stakeholders meeting, for example, after telling Ms. Chandler earlier that day that CFSA was violating its FYAA obligation to report "outcomes,"

Ms. Greene declined to affirm Ms. Chandler's statement that CFSA issued findings when it was accused of retaliating against youth or foster parents who complained. In response to the intake-form directive, Ms. Greene provided Ms. Chandler with three case examples, which Ms. Greene subsequently sent to Director Donald, detailing unlawful conduct by CFSA or its contracting agencies to make the point that using a non-confidential intake form would compromise her ongoing investigations. Similarly, during the drafting and editing process of the 2016 Trend Report, Ms. Greene not only expressed her belief that removing the "trends" section would violate the FYAA's requirement to publish "outcomes" but also laid out several current CFSA practices that violated additional FYAA provisions. These practices included CFSA's 2015 Trend Report publishing only data from older youth rather than for youth of *all* ages as the FYAA requires, D.C. Code § 4-1303.71, and withholding records from youth formerly under CFSA's care in violation of the FYAA. *Id.* §§ 4-1303.73(a)-(b); *id.* § 4-1303.72(b)(1).

Ms. Greene's repeated requests for legal justifications for the directives she received further underscore the genuineness of her belief that she was reporting unlawful conduct. For example, Ms. Greene requested that the intake-form directive be in writing that assured its compliance with governing law. Again, in April 2017, Ms. Greene asked that the directives from Ms. Chandler and Ms. Joseph—that she use the intake form, share details of complaints, and refrain from publishing all

investigative findings—be made in writing from Director Donald with legal justification.

## 2. Reasonableness

There is also sufficient evidence for a factfinder to conclude that Ms. Greene's belief that her disclosures revealed unlawful conduct was a reasonable one. The District advances various arguments that Ms. Greene's belief was unreasonable, none of which we find persuasive. Because we understand each of the District's principal arguments to address multiple of the six disclosures Ms. Greene alleges, we discuss the reasonableness of the disclosures argument by argument rather than analyzing the disclosures one by one.

We assess the reasonableness of Ms. Greene's belief using a "disinterested observer" test—her belief is reasonable if a disinterested observer with knowledge of the essential facts known to and readily ascertainable by Ms. Greene could reasonably conclude that CFSA violated the FYAA. *Ukwuani*, 241 A.3d at 552. We need not consider whether CFSA actually violated the FYAA. *Freeman*, 60 A.3d at 1141. In relevant part, the FYAA mandates that CFSA "shall develop. . . a mechanism for receiving and handling complaints or concerns made by youth or on behalf of youth and provide a mechanism to resolve issues related to the youth's care, placement, and services throughout [CFSA]." D.C. Code § 4-1303.74(a). The

FYAA also requires that CFSA "make available to the Council a report containing data collected over the course of the prior year that includes. . .[t]he trends and issues that arose in the course of investigating concerns and outcomes of the investigations conducted." D.C. Code § 4-1303.74(b)(3)(E).

The District first contends that Ms. Greene's interpretation of the FYAA's "outcomes" as encompassing her investigative findings was unreasonable. Similarly, the District argues that Ms. Greene unreasonably believed that including single incidents in the Trend Report was necessary to comply with the FYAA. Looking to the plain meaning of the statute, however, Ms. Greene's findings—as discussed in her September 15, 2016, meeting with Ms. Chandler and laid out in the draft Trend Report—can reasonably be included within the "outcomes" contemplated by the statute. *See Dobyns v. United States*, 30 A.3d 155, 161 (D.C. 2011) (looking to the ordinary meaning of a statutory term when the meaning is clear). Ms. Greene's interpretation of "outcomes" as including her investigative findings is also reasonable if we look to the FYAA's stated purpose, which is, in part, to "outline [CFSA's] annual reporting and data-sharing requirements to the Council and public on concerns and outcomes." Foster Youth Rights Amendment Act of 2012, D.C. Act 19-640, D.C. Law 19-276, 60 D.C. Reg. 2060 (January 23, 2013). *See Frankel v. D.C. Office for Planning & Econ. Dev.*, 110 A.3d 553, 558 (D.C. 2015) (considering a statute's statement of purpose to discern the Council's

intent). Even if the "trends" that Ms. Greene included in her draft Trend Report were based on single incidents and thus could not be reasonably interpreted as "trends" under the FYAA, as the District suggests, it would still be reasonable to interpret those discussions as being required as "outcomes" under the statute. The District also argues that because Ms. Chandler and other supervisors were lawyers, while Ms. Greene was not, a disinterested observer would not reasonably share Ms. Greene's interpretation of the FYAA. But Ms. Greene recognized this fact, asking Ms. Chandler on several occasions, detailed above, for a legal justification for the directives she thought might violate the FYAA. The record does not reflect that she received one.

We find further support for the reasonableness of Ms. Greene's genuine belief that she was reporting illegal conduct in the D.C. Council's passage of a 2020 law, amended in 2021, that, at least in part, formalized many of Ms. Greene's suggestions around CFSA's Ombudsman role. Office of the Ombudsperson for Children Establishment Amendment Act of 2020, D.C. Act 23-617, 68 D.C. Reg. 1510 (Feb. 2, 2021) (adding D.C. Code §§ 4-671.01-12) (hereinafter, "Ombudsperson Act"). The Government Accountability Project points out in an amicus brief that the Council unanimously passed legislation to "establish the Office of the Ombudsperson for Children as an independent, impartial office" with a mandate to improve the lives of children in the care of or involved with CFSA,

D.C. Code § 4-671.02.[4]  The Ombudsperson Act contains a subsection on reporting requirements for CFSA that echoes the language of the FYAA's mechanism reporting requirement, *compare* D.C. Code §§ 4-671.08(b) *with* D.C. Code § 4-1303.74(b)(1), and adds that the Ombudsperson office "shall include. . . trend analyses" and a "summary of systemic investigations."  D.C. Code §§ 4-671.08(b)(1)(C)-(D).  We disagree with the District's contention that the passage of the Ombudsperson Act suggests that Ms. Greene's prior reading of the FYAA was unreasonable; instead, we conclude that the legislation cuts in the opposite direction, clarifying what the FYAA intended CFSA's reporting to be.  Interpreting the Council's recent legislation as contrary to the FYAA, as the District would have us do, rather than clarifying the CFSA's reporting requirements, "would [] sow inconsistencies" between the statutes, "which is another point against that interpretation." *Sivaraman v. Guizzetti & Assocs., Ltd.*, 228 A.3d 1066, 1076 (D.C. 2020) (wage laws dealing with the same subject matter should be interpreted harmoniously where possible).

---

[4] Ms. Greene testified as a public witness before the Council's Committee on Human Services during the public hearing on the Ombudsperson Act before it was passed.  Public Hearing on Bill No. 23-437, "Child Safety and Well-Being Ombudsperson Establishment Act of 2019," at 81-88 (Oct. 28, 2019).  Her oral and written testimony included descriptions of the events detailed here during her time as Ombudsman at CFSA, her emails to CFSA leadership regarding her concerns about the 2016 Trend Report, and excerpts of the 2016 Trend Report itself.

Beyond its argument that Ms. Greene's interpretation of the FYAA was unreasonable, the District casts Ms. Greene's disclosures as too minimal to reasonably be thought of as serious violations of D.C. law. However, we are unable to square the District's contention that any efforts to prevent Ms. Greene from reporting outcomes—whether in the September 15 meetings or the Trend Report—cannot reasonably be interpreted as anything more than minimal FYAA violations when one of the animating purposes of the FYAA legislation is requiring CFSA to report to the public on "concerns and outcomes." Foster Youth Rights Amendment Act of 2012, D.C. Act 19-640, D.C. Law 19-276, 60 D.C. Reg. 2060 (January 23, 2013). The District also contends that the record offers no evidence that Ms. Greene believed CFSA's "occasional failure" to release records to foster youth rose to the level of seriousness required by the WPA. But, like the reporting requirements, the distribution of records is a prominent part of the FYAA's stated purpose, which is, in part, to ensure that youth in foster care "have the right to receive. . . certain information before leaving care." *Id.*

With respect to the three alleged disclosures surrounding the 2016 Trend Report in particular, the District argues that Ms. Greene's belief that her supervisor's edits violated the FYAA was unreasonable because she failed to point to specific supervisor edits. But Ms. Greene did point to specific supervisor edits by highlighting the references to trends and outcomes in her draft that supervisors

removed in their edits—deletions that she claims violated the FYAA's directive to report "outcomes," "trends[,] and issues." D.C. Code § 4-1303.74(b)(3)(E). The District also argues that the supervisors' edits were made to a *draft* of the Trend Report, rendering any of Ms. Greene's purported disclosures as only potential violations of law because the final report is not in evidence. The District correctly points out that we have reserved judgment as to "whether voicing a concern about a proposal that is then abandoned" is protected under the WPA. *Tingling-Clemmons v. District of Columbia*, 133 A.3d 241, 246 n.19 (D.C. 2016) (discussing appellant's expressed concern about a manager's suggestion to divert funds where the complaint does not allege that the funds were, in fact, diverted). However, the repeated efforts by Ms. Greene to include discussions of her investigatory findings in the Trend Report and her supervisors' continued attempts to remove them—even if they ended up back in the final report—go far beyond the once-expressed concern we contemplated in *Tingling-Clemmons*.

Finally, the District argues that Ms. Greene's failure to identify violations of specific provisions outside the FYAA forfeits those claims, or, alternatively, demonstrates that her belief that CFSA violated other laws was unreasonable. Ms. Greene alleges that she disclosed non-FYAA violations in both her response to Ms. Chandler's intake-form directive and her subsequent email to Director Donald, which included her email to Ms. Chandler. But the attachment included in both

emails can be construed as disclosing FYAA violations as well—in discussing the reasons she was wary of the intake form, Ms. Greene highlights that her role is already restricted because she "had been told not to release 'rights violations'" found in her investigation of complaints. For the reasons stated above, we conclude that Ms. Greene was reasonable in her belief that limitations on reporting her investigative findings were non-minimal violations of the FYAA. To the extent that Ms. Greene's intake-form email to Ms. Chandler and subsequent email to Director Donald describe other possible legal violations without naming particular provisions, Ms. Greene's "failure to use legal terminology or to specifically mention" a law or provision "is not fatal" to her claim. *Holbrook*, 259 A.3d at 90 (concluding in the context of the DCHRA that an appellant is not required to state "magic words" such as "discrimination" where violations can be "inferred or implied from the surrounding facts" (internal quotations omitted)). Given the detailed facts included in Ms. Greene's email attachments, which, for example, describe CFSA's "non-adherence or enforcement of DCMR licensing standards," we conclude that Ms. Greene's belief that she was disclosing unlawful conduct to her supervisors was reasonable.

## B.     Causal Nexus

After finding that none of the disclosures that Ms. Greene alleged was WPA-protected, the trial court briefly asserted that "even if we assume that there was some report of illegal activity in [Ms. Greene's email] attachments, there's no causation."[5]  In the trial court's view, "the mention of illegal acts in an attachment to a series of e-mails could not possibly be the causation" of Ms. Greene's termination because "it was just not at all the focus of the discussion."  We read the record differently.  The illegal acts that Ms. Greene mentioned in the attachment to her September 19, 2016 email to Ms. Chandler and her October 28, 2016 email to Director Donald were very much the focus of the discussion with her supervisors. The heart of the disagreement was whether Ms. Greene was legally mandated to investigate and publicly report the very conduct described in her email attachments. Simultaneously, however, CFSA points to evidence in the record showing that Ms. Greene was insubordinate, refusing to heed the directives of her supervisors and accept the boundaries they placed around her Ombudsman role.[6]  We see the

---

[5] The trial court also stated that it would "incorporate–in the alternative the arguments that the District has made" but that its analysis turned on a finding that the disclosures were policy disagreements rather than WPA-protected conduct.

[6] The District contends that Ms. Greene has forfeited any causation-related arguments because she failed to develop argumentation disputing the District's stated reasons for terminating her employment at CFSA.  As the District points out, our practice is not to consider arguments that are not raised in an opening brief, *Comford v. United States*, 947 A.2d 1181, 1188 (D.C. 2008), but we find that

evidence of Ms. Greene's insubordination in this extensive record as being intertwined with that of her WPA-protected disclosures, meriting more than cursory treatment.

Though both Ms. Greene and the District urge us to rule on the causation issue, we decline to do so. The disentangling of the causation evidence here is a careful, fact-intensive task for a trial court to rule on in the first instance, and the trial court did not engage in such analysis here. We therefore remand the question of a causal connection between Ms. Greene's protected disclosures and her termination for the trial court to consider whether there remains a genuine issue of material fact in light of this opinion's protected-disclosure analysis and the full evidence in the record. *Bartel v. Bank of America Corp.*, 128 A.3d 1043, 1048 (D.C. 2015) (citing *Folks v. District of Columbia*, 93 A.3d 681, 686 (D.C. 2014)) (remanding to the trial court at the summary judgment stage on an unresolved issue).

### III. Conclusion

For the foregoing reasons, we reverse the trial court's grant of summary judgment, in part, because we conclude that Ms. Greene's disclosures are protected under the WPA. We remand the case for the trial court to consider, consistent with

---

Ms. Greene's opening brief—in its questions presented and throughout a discussion of the discrete disclosures—sufficiently briefed the issue so as to avoid waiver. Nonetheless, we remand consideration of parties' causation arguments to the trial court.

our holding that Ms. Greene's disclosures are WPA-protected and in light of the full evidence in the record, whether there is a genuine issue of material fact that Ms. Greene's WPA-protected disclosures were a cause of her termination at CFSA.

*So ordered.*